CARL K. BROOKE and MARY E. BROOKE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brooke v. Commissioner
Docket No. 5355-84.
United States Tax Court
T.C. Memo 1987-400; 1987 Tax Ct. Memo LEXIS 397; 54 T.C.M. (CCH) 132; T.C.M. (RIA) 87400; August 12, 1987. Irwin Scherago, for the petitioners. Catherine R. Chastanet, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the year 1979 in the amount of $ 12,819.98. The only issue remaining for decision is whether petitioners may deduct from their 1979 income, pursuant to section 162(a), [1] the amount of $ 31,139 paid to petitioner Carl K. Brooke by his employer as per diem reimbursement for expenses incurred while he was working in Saudi Arabia. *398 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. Petitioners resided in Port Washington, New York at the time the petition was filed in this case. Petitioner Carl K. Brooke (petitioner) was employed in Saudi Arabia by Pan American World Airlines, Inc. (Pan Am) during the period from November 17, 1978 through December 2, 1981. Petitioner was employed as a member of a team of technical advisors to International Airport Projects (IAP), an agency of the Saudi Arabian government which was constructing an airport at Jeddah, Saudi Arabia. Petitioner, as part of the Pan Am team, was a facilities engineer with a primary responsibility to coordinate construction and programs to make a fully operational airport. IAP retained Pan Am by a letter agreement dated December 25, 1978, to render technical advice on the Jeddah International Airport through a team of no more than 11 persons "until such time that we select our operations contractors *399 or a period of approximately 6 months which ever is earlier." There was no employment agreement for any fixed period of time, other than the December 25, 1978 letter agreement. Pan Am secured this letter agreement contract with IAP by making an unsolicited offer which IAP accepted. Under this letter agreement, Pan Am was to act as the interim technical advisor for operating the airport until a permanent operating contractor could be secured by IAP through the process of taking formal bids. Pan Am submitted its unsolicited offer with the hope of acquiring the permanent contract. Pan Am, however, was not awarded the permanent contract. Pan Am employees were retained by IAP in Saudi Arabia under the letter agreement to assist and work with the corporation to which the permanent contract was awarded. Pan Am's employees in Saudi Arabia, however, could have been terminated by IAP at any time for any reason. During the period Pan Am was retained by IAP, some of the Pan Am employees in Saudi Arabia had their participation on the airport project terminated by letter from IAP. These terminations were to take effect immediately. Starting from the time petitioner commenced employment *400 on the project, however, Pan Am employees were present for at least 37 months bringing the operations of the airport up to the standards set by the Saudi Arabian government. Petitioner was placed in Saudi Arabia pursuant to Pan Am's letter agreement. Petitioner remained in Jeddah from November 17, 1978 through December 2, 1981. Petitioner's visa under which he entered Saudi Arabia was originally issued on October 16, 1978 and was valid for two months, with the period of stay started as three months. Petitioner's visa was renewed on February 6, 1979, to be valid for an additional two months for a stay of up to three months. Following this renewal, the government of Saudi Arabia did not stamp petitioner's passport with any additional resident visas which stated a specific period of validity or an expected length of stay in Saudi Arabia. Petitioner was terminated by a letter from IAP dated October 31, 1981. Petitioner had not sought a work assignment from Pan Am in the United States during the time he was assigned by Pan Am to Jeddah. Petitioner's two prior jobs had been in Bahrain and Riyadh, Saudi Arabia, each for approximately two years. Petitioner was paid a per diem of *401 $ 100 by Pan Am for every day he was physically present in Saudi Arabia. This per diem amount was in addition to petitioner's salary and was paid in lieu of other expenses. Petitioner was paid by Pan Am a total per diem amount of $ 31,139 in 1979. In addition to the per diem, Pan Am provided petitioner with his living accommodations during the period he was in Saudi Arabia and provided petitioner with airline tickets for his flights between Saudi Arabia and the United States. Pan Am also furnished petitioner with a car during his stay in Saudi Arabia. For the first five months he shared a car with four or five other Pan Am employees. Petitioner was then furnished with his own car for the duration of his stay in Saudi Arabia, at no cost to him. Petitioner did pay for gas and maintenance of the car. Petitioner did not incur any moving or storage expenses when he relocated to Saudi Arabia in November of 1978. Nor did petitioner incur schooling expenses for his children which he would not have incurred had he resided in the United States during 1979. At all times during 1979, 1980, and 1981, petitioner owned three pieces of real estate property in the United States. These *402 properties were located in Rockbridge, Ohio (the Rockbridge property), Port Washington, New York (the Port Washington property), and Sands Point, Port Washington, New York (the Sands Point property). Between January 1, 1979 and April 1, 1979, petitioner's wife and children occupied the Rockbridge property. For the remainder of 1979 this property was maintained but not rented by petitioner. Petitioner maintained but did not rent the Rockbridge property during 1980 and 1981. Between April 1, 1979 and September 1, 1979, petitioner's children occupied a portion of the Port Washington property. Between July 5, 1979 and September 1, 1979, petitioner's wife also occupied a portion of the Port Washington property. The remainder of the Port Washington property was rented throughout 1979 and the entire property was rented during 1980 and 1981. The Sands Point property was rented to tenants from January 1, 1979 through August 30, 1979. Between September 1, 1979 and December 31, 1979, petitioner's children resided at the Sands Point property. During 1980 and 1981, petitioner maintained the Sands Point property for the use of his family. Petitioner paid all the expenses of maintaining *403 the three properties. Petitioner's wife was living with petitioner in Saudi Arabia during the following periods: From
To
No. of Days
Total Days During Year
4/1/79
7/4/79
95
9/20/79
12/31/79
103
198
1/1/80
4/24/80
115
6/27/80
9/3/80
69
9/14/80
12/11/80
89
273
1/23/81
4/3/81
71
4/30/81
7/16/81
78
9/18/81
12/2/81
76
225
Petitioner's children Terri Brooke and Carl Jonathan Brooke were enrolled in college in the United States as follows: Child
College
Dates of Attendance
Terri
Ohio University
January 1979 to June 1979
New York University of
September 1979 to
Technology
December 1981
Carl
Ohio University
January 1979 to June 1979
Nassau Community College
January 1980 to June 1980
As part of their 1979 Federal income tax return, petitioners completed a Form 2555, Deduction from, or Exclusion of, Income Earned Abroad. As part of this form, petitioner listed his places of residence during 1978 and 1979 as "Bahrain July 19 '76 to Aug 27 '78 -- Saudi Arabia Nov 17 '78 to present June 15, 1980." Petitioner listed the only contractual terms or other conditions *404 relating to the length of his employment abroad as "indefinite stay." Petitioner did indicate that he was maintaining a home in the United States while residing abroad. Over the period from November 1978 to May 1980, petitioner spent no more than 28 days in the United States. During 1979, petitioner's daughter Terri spent 58 days with petitioner in Jeddah. OPINION Section 162(a) allows a deduction for "traveling expenses (including amounts expended for meals and lodging * * *) while away from home in the pursuit of a trade or business." [2] In order for traveling expenses to be deductible pursuant to section 162(a) they must be: (1) reasonable and necessary; (2) incurred while "away from home;" and (3) incurred in pursuit of a trade or business. ; . Petitioners bear the burden of proving the amount of any traveling expenses they have incurred and that such amounts satisfy the requirements of section 162(a). ; Rule 142(a).[3]
*405 The Second Circuit of Appeals, to which an appeal in this case lies, [4] has held that for purposes of section 162(a), a taxpayer's home is his permanent abode or residence and that a taxpayer must have such a home in order to be considered "away from home." ; . [5] With respect to determining whether "away from home" expenses are reasonable, necessary, and incurred in pursuit of a trade or business, the Second Circuit has stated, When an assignment is truly temporary, it would be unreasonable to expect the taxpayer to move his home, and the expenses are thus compelled by the "exigencies of business"; when the assignment is "indefinite" or "indeterminate," the situation is different and, if the taxpayer decides to leave his home where it was, disallowance is appropriate, not because he has acquired a "tax home" in some lodging house or hotel at the worksite but because his failure to move his home was for his personal convenience and not compelled by business necessity. * * * [.] *406 Temporary employment means "the sort of employment in which termination within a short period of time could be logically expected and foreseen." . See also , affg. per curiam a Memorandum Opinion of this Court. Accordingly, if termination of employment is neither expected nor reasonably foreseeable within a fixed or short period of time, the taxpayer's expenses are not the result of the "exigencies of business" and are not deductible pursuant to section 162(a). In the case before us, petitioner relocated to Jeddah, Saudi Arabia as part of a team of technical advisers and remained employed in Jeddah in the same position for 37 months. Petitioner's wife spent approximately 23 of the 37 months with him in Jeddah and spent most of the balance of such time living with their children who were attending college in the United States. Petitioner's wife spent more than half of 1979 with him in Jeddah and his daughter spent approximately 58 days with him in Jeddah during 1979. During the period from November 1978 to May 1980, however, petitioner spent no more than *407 four weeks in the United States. Petitioners support their contention that petitioner's job in Jeddah during 1979 was temporary by pointing to the fact that petitioner was sent to Jeddah pursuant to Pan Am's letter agreement and that this letter agreement provided for Pan Am's technical team to stay in Jeddah for no more than six months. Petitioner's job in Saudi Arabia as he describes it, however, was to coordinate construction and programs to make a fully operational airport. Petitioner testified that accomplishing this job in line with the standards set by the Saudi government required the full 37 months he spent in Jeddah. Petitioner has not adequately explained how a job that was allegedly expected to last no more than six months could have stretched into a job with a 37 month duration. Nor has petitioner explained the agreements or mechanism by which he was retained in Saudi Arabia beyond the original six month term of the agreement. In addition, we note that at the time petitioner was sent to Jeddah, Pan Am was seeking a permanent contract to operate the airport at Jeddah. Petitioners have not introduced evidence with respect to the expected likelihood of Pan Am's *408 receiving the permanent contract at the time petitioner relocated to Jeddah. Nor have we been informed of what the effect of Pan Am's receiving the permanent contract would have been upon the length of petitioner's stay in Jeddah. Finally, on Form 2555 of his Federal income tax return for 1979, petitioner claimed to be a bona fide resident of Saudi Arabia during 1979. Petitioners argue that the section 911 exclusion which they sought on their Form 2555 is not inconsistent with claiming "away from home" type expenses under section 162(a). Their argument, however, is based on their reading of the law and regulations as providing that the section 911 exclusion does not require residence in a foreign country, [6] it being sufficient to show physical presence for a prescribed percentage of time. Whether or not they needed to, however, petitioners did claim residence in Saudi Arabia for the purpose of claiming the section 911 exclusion. We believe that this fact is evidence of petitioners' actual view of the location of their residence in 1979. Conceptually we find it difficult in this case to square a claim for a section 911 exclusion based on being a bona fide resident of a foreign *409 country with a simultaneous claim for travelling expenses "while away from home" under section 162(a). Based on the above facts, petitioners have failed to prove that the termination of petitioner's job within a fixed or short period of time was expected or reasonably foreseeable in 1979. Petitioner's job in Saudi Arabia was therefore indefinite rather than temporary and expenses incurred by petitioner in Saudi Arabia were "for his personal convenience and not compelled by business necessity." [7]. Accordingly, petitioners are not entitled to deduct the per diem amounts paid to petitioner by Pan Am during 1979. *410 To reflect concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the year in issue. ↩
2. On their Federal income tax return for the year 1979, petitioners treated the per diem amounts received from Pan Am as excludible from income. Petitioners now concede that such amounts should have been reported as income, but argue that they were entitled to deductions in the same amounts pursuant to section 162(a). ↩
3. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. See , affd. . ↩
5. Cf. ; ; , with respect to the location of a taxpayer's home for purposes of section 162(a). ↩
6. Respondent has not disputed that petitioners were entitled to claim the section 911 exclusion. ↩
7. On this record, we also find it difficult to determine that petitioner had a home in the United States within the meaning of section 162(a). ; . Prior to his job in Jeddeh, petitioner's jobs consisted of projects in Riyadh, Saudi Arabia and Bahrain for two years each. While petitioner did maintain real property in the United States, we do not know whether petitioner resided at any of these properties at any time. Petitioner's children apparently occupied all or a part of whichever property was closest to the college they were attending. Petitioner's wife, while in the United States, stayed at the property at which the children resided. ↩